# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 18, 2020

Lyle W. Cayce
Clerk

No. 18-41120

Sahara Health Care, Incorporated,

*Plaintiff—Appellant*,

*versus*

Alex M. Azar, II, Secretary, U.S. Department of Health and Human Services; Seema Verma, Administrator for the Centers for Medicare and Medicaid Services,

*Defendants—Appellees*.

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 7:18-CV-203

Before Elrod, Willett, and Oldham, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:[*]

Congress devised an intricate procedure for medical providers to dispute Medicare recoupment: four layers of administrative review, followed by review in a federal court. But over a period of five years, administrative

---

[*] Judge Oldham concurs in the judgment only.

No. 18-41120

appeals for Medicare recoupment grew twelve-fold. At its peak, the backlog of appeals grew to a ten-year wait. This logjam resulted in a remarkable opinion by the D.C. Circuit, in which that court told Congress that it would likely mandamus the Secretary of Health and Human Services if the political branches "failed to make meaningful progress within a reasonable period of time—say, the close of the next full appropriations cycle." *See Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 193 (D.C. Cir. 2016). As they say, the best laid plans of mice and men oft go awry.[1]

Sahara Health Care is a provider stuck in this bureaucratic mire. The government told Sahara that past Medicare reimbursements had been overpaid and were ripe for recoupment. After step two of the four-step administrative review process (with fifth-step judicial review), HHS began to recoup overpayments from Sahara's present and future reimbursements. Although the statute requires an ALJ hearing and decision within 90 days of a request, the current ALJ backlog results in a typical three-to-five year wait.

Sahara sought injunctive relief, asserting that its statutory and due process rights were violated and that the government acted *ultra vires* by recouping payments without providing a timely ALJ hearing. The district court granted the government's motion to dismiss, holding alternatively that Sahara lacked a protected property interest in forestalling the recoupment and that the government had provided adequate process. It also concluded that the government had not exceeded its statutory authority. Because we agree

---

[1] *Cf.* Robert Burns, *To a Mouse* (1785) ("The best-laid schemes o'mice an' men / Gang aft agley[.]").

No. 18-41120

that the government provided Sahara adequate process and complied with the statute, we AFFIRM.

I.

The Medicare program processes over a billion claims each year. CTRS. FOR MEDICARE & MEDICAID SERVS., The Medicare Recovery Audit Contractor (RAC) Program: An Evaluation of the 3-Year Demonstration at 9 (2008). It cannot inspect each claim as it comes. Instead, it generally pays facially valid claims, and conducts post-payment audits to detect overpayments. *See* 42 U.S.C. § 1395ddd; *see generally Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1156–57 (9th Cir. 2012) (outlining the operation of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108–173, 117 Stat. 2066, (2003), which governs recoupment). Providers who wish to challenge an overpayment determination have access to four phases of administrative review culminating in a phase five judicial review. *See* 42 U.S.C. § 1395ff.

Sahara Health Care is a home health agency that depends on Medicare reimbursements for about 75% of its revenue. In 2017, a Medicare contractor audited a sample of Sahara's claims and, after analysis and extrapolation, calculated that HHS had overpaid it about $3.6 million. The government wanted that money back. Sahara objected. After two levels of administrative review, Sahara had successfully reduced that number down to about $2.4 million (excluding interest). Sahara believed that was still excessive. It exercised its statutory right to an ALJ hearing within 90 days of a request. Unfortunately for Sahara, the massive administrative backlog resulted in a three-to-

five year wait for a hearing. *See Cumberland Cty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 50–51 (4th Cir. 2016). This case arises from the conflict between the statutory right to a hearing within 90 days and the administrative reality that no such hearing occurs for years.

## A.

The first phase of administrative review is a "redetermination" from an HHS contractor. *See* 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.948. Second, a provider can seek "reconsideration" from a qualified independent contractor. *See* 42 U.S.C. § 1395ff(b)–(c), (g); 42 C.F.R. §§ 405.902, 405.904(a)(2). At steps one and two, a provider may submit additional evidence and must put forth a written explanation of its disagreement with the initial determination. 42 C.F.R. §§ 405.946(a); 405.966(a). If it wants to submit evidence, that is the time: "A provider of services or supplier may not introduce evidence" after step two "unless there is good cause which precluded the introduction of such evidence at or before that reconsideration." 42 U.S.C. § 1395ff(b)(3); 42 C.F.R. § 405.966(a)(2). Redetermination at step one and reconsideration at step two result in reasoned, written decisions. *See* 42 U.S.C. § 1395ff(a)(5) (requiring "written notice" with "specific reasons" at step one); 42 C.F.R. § 405.956(b) (detailing content of step one decision); 42 U.S.C. § 1395ff(c)(3)(E) (requiring "a detailed explanation of the decision" at step two); 42 C.F.R. § 405.976(b) (detailing content of step two decision). The process does not end there.

At step three, a provider is entitled to a hearing and decision from an ALJ, who must "render a decision on such hearing by not later than the end

of the 90-day period" after the request was timely filed.    42 U.S.C. § 1395ff(d)(1)(A).  Congress specified what happens when an ALJ misses that deadline:

> In the case of a failure by an administrative law judge to render a decision by the end of the period described in paragraph (1), the party requesting the hearing may request a review by [the HHS Appeals Board] notwithstanding any requirements for a hearing for purposes of the party's right to such a review.

42 U.S.C. § 1395ff(d)(3)(A).

The Appeals Board then has 90 days to conduct a *de novo* review and issue a decision, or 180 days if the case was "escalated" to skip the step-three hearing.  42 U.S.C. § 1395ff(d)(2)(A); 42 C.F.R. §§ 405.1100(c) (*de novo* review); 405.1100(d) (180 days if escalated).  Congress anticipated that the Appeals Board deadline might pose some problems.  After 180 days have passed without a board decision, the statute permits a party to "seek judicial review, notwithstanding any requirements for a hearing for purposes of the party's right to such a judicial review."  42 U.S.C. § 1395ff(d)(3)(B).

## B.

Recoupment is "the recovery by Medicare of any outstanding Medicare debt by reducing present or future Medicare payments and applying the amount withheld to the indebtedness."  42 C.F.R. § 405.370.  Congress prohibited HHS from recouping payments during the first two stages of administrative review.  42 U.S.C. § 1395ff(f)(2)(A).  After those two appeals, however, if a provider is still found to have been overpaid, "recoupment remains in effect."  42 C.F.R. § 405.379(d)(4)–(5).  HHS must provide an overpaid

provider with notice and an opportunity to respond in writing. 42 C.F.R. §§ 405.373(a), (b)(1).

If repayment of an overpayment would constitute an "extreme hardship, as determined by the Secretary," the agency "shall enter into a plan with the provider" for repayment "over a period of at least 60 months but . . . not longer than 5 years." 42 U.S.C. § 1395ddd(f)(1)(A). That hardship safety valve has some exceptions that work against insolvent providers. If "the Secretary has reason to believe that the provider of services or supplier may file for bankruptcy or otherwise cease to do business or discontinue participation" in the Medicare program, then the extended repayment plan is off the table. 42 U.S.C. § 1395ddd(f)(1)(C)(i). A provider that ultimately succeeds in overturning an overpayment determination receives the wrongfully recouped payments with interest. 42 U.S.C. § 1395ddd(f)(2)(B).

## C.

A years-long administrative logjam helps explain why Sahara filed this lawsuit. Between 2009 and 2014, the number of ALJ appeals increased more than 1,200 percent. OMHA, HHS, *Fiscal Year 2017 Justification of Estimates for Appropriations Committee* 8 (FY 2017 Budget). The agency's budget did not receive a similar increase. Cases piled up. At its peak in 2016, HHS had almost ten years of appeals pending. *See Cumberland Cty. Hosp.*, 816 F.3d at 50–51. The agency has since received a funding increase, and currently expects to clear the backlog by 2022. *See Am. Hosp. Ass'n v. Azar*, No. 14-cv-851, 2018 WL 5723141 (D.D.C. Nov. 1, 2018). In fact, the Secretary is under

No. 18-41120

a mandamus order requiring such a timetable. *See id.* at *1. But 2022 is still a ways off, and multi-year waits are abundant.

D.

Sahara was notified of a $3.5 million overpayment determination in February 2017. It appealed. At step one ("redetermination"), after multiple requests and corrected decisions, the overpayment determination was partially upheld. Sahara went to step two ("reconsideration"), and ultimately received a revised overpayment demand of $2.4 million in July 2018. In June 2018, Sahara timely requested an ALJ hearing.[2] The next month, it requested an extended repayment schedule to pay down the debt over ten years. The agency denied the request, noting that it lacked statutory authority to extend schedules longer than five years. Sahara was financially unable to accept a five-year plan, which "would have had a devastating impact on the business' [sic] financial well-being."[3]

Four days after it requested an ALJ hearing, Sahara filed a lawsuit for injunctive relief in the Southern District of Texas. The district court granted the government's motion to dismiss and denied Sahara's motions for a preliminary injunction and temporary restraining order. The district court held that Sahara had no protected "property interest in the recoupment or forestalling of the recoupment." The claim also failed, the district court

---

[2] The ALJ hearing was requested before the final reconsideration decision because reconsideration involves multiple submissions and decisions.

[3] Since the filing of this appeal, Sahara entered a graduated repayment plan that currently requires payments of $10,000 per month, ramping up to $75,000 in February 2021.

concluded, because Sahara received constitutionally adequate process. Finally, the district court dismissed the *ultra vires* claim, explaining that Sahara asserted "only conclusory statements" and that Medicare's "backlog argument falls outside the Court's jurisdiction." Sahara appealed.

## II.

"This court reviews a district court's decision to dismiss under rule 12(b)(6) *de novo.*" *O'Daniel v. Indus. Serv. Sols.*, 922 F.3d 299, 304 (5th Cir. 2019). Accepting the plaintiff's factual allegations as true, those facts must state a claim that is plausible on its face. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012).

To be entitled to a preliminary injunction, Sahara must demonstrate that: (1) it is substantially likely to succeed on the merits of its claim; (2) it will suffer irreparable injury in the absence of injunctive relief; (3) the balance of the equities tips in its favor; and (4) the public interest is served by the injunction. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012). We review the denial of injunctive relief for abuse of discretion. *Id.*

We have jurisdiction under the collateral-claim exception to the Medicare Act's administrative exhaustion requirement. *See Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 (5th Cir. 2018).

No. 18-41120

III.

In its complaint, Sahara asserted one count of procedural due process and one count of *ultra vires* acts.[4] To succeed on a constitutional due process claim, Sahara must demonstrate that the balance of the private interest, government interest, and value of additional procedure weighs in its favor. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Its *ultra vires* claim is straightforward: Sahara argues that the government acted without statutory authority by recouping payments before it had provided an ALJ hearing. We reject each claim.[5]

---

[4] District courts in this circuit have divided on the due process question. *Compare, e.g., Sahara Health Care, Inc. v. Azar*, 349 F. Supp. 3d 555, 579 (S.D. Tex. 2018) (dismissing due process claim), *and Supreme Home Health Servs., Inc. v. Azar*, 380 F. Supp. 3d 533, 556 (W.D. La. 2019) (same), *with Adams EMS, Inc. v. Azar*, No. H-18-1443, 2018 WL 5264244, at *12 (S.D. Tex. Oct. 23, 2018) (granting injunctive relief on due process claim), *and Family Rehab., Inc. v. Azar*, No. 3:17-CV-3008-K, 2018 WL 3155911, at *4 (N.D. Tex. June 28, 2018) (same).

[5] In its reply brief, Sahara contends that collection of overpayments is "no longer legally enforceable" because: (1) the recoupment was promulgated under the Patient Protection and Affordable Care Act; (2) a district court held that ACA's individual mandate was unconstitutional and inseverable from the ACA, *see Texas v. United States*, 340 F. Supp. 3d 579, 585 (N.D. Tex. 2018); and (3) the federal government agreed. This argument has many flaws, but we limit ourselves to three. First, we ordinarily disregard arguments raised for the first time in a reply brief. *See Hardman v. Colvin*, 820 F.3d 142, 152 (5th Cir. 2016). Even if the argument were properly presented, we would reject it. The Secretary's recoupment authority does *not* derive from the ACA. The laws authorizing recovery of overpayments are codified at 42 U.S.C. § 1395ddd(f). Congress enacted those provisions as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108–173, 117 Stat. 2066. The ACA amended subsections (a) and (h) and added subsection (i). *See* Pub. L. No. 111-148, 124 Stat. 119. It did not amend or affect subsection (f), and it has no relevance to this case. And even if recoupment were a part of the ACA, the federal government would still be allowed to enforce the statute while simultaneously contesting its constitutionality. *See United States v. Windsor*, 570 U.S. 744, 749–53 (2013).

No. 18-41120

A.

The Fifth Amendment guarantees that no person shall "be deprived of . . . property . . . without due process of law[.]"  U.S. Const. amend. V. Administrative deprivations of property are governed by the "familiar procedural due process inspection instructed by *Mathews v. Eldridge*, 424 U.S. 319 (1976)[.]"  *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017).  Under this exemplar of "th'ol' totality of the circumstances test," *see United States v. Mead Corp.*, 533 U.S. 218, 241 (2001) (Scalia, J., dissenting) (internal quotation marks omitted), the court balances the private interest, the governmental interest, and the costs and benefits of additional procedures.  Specifically, one looks to:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

To successfully invoke the Due Process Clause, a plaintiff must demonstrate that it has a protected property or liberty interest at issue.  *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–71 (1972).  Sahara maintains that it has a property interest in "Medicare payments it has earned for services rendered on properly billed claims."  This court has rejected a similar theory, where providers argued that they had "a property interest in

legitimately earned, current [Medicaid] reimbursements that are not subject to investigation." *See Pers. Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 159 (5th Cir. 2011). But because we conclude that the government provided Sahara adequate process, we decline to decide the property interest question.[6] *Cf. Accident, Injury & Rehab., PC v. Azar*, 943 F.3d 195, 204 (4th Cir. 2019) (rejecting identical due process claim while declining to determine whether provider had protected property interest).

Looking to the first and third *Mathews* factors, Sahara's private interest in adding a hearing outweighs the government's interest in efficient recoupment administration. But turning to the second *Mathews* factor, the sufficiency of the current procedures and the minimal benefit of the live hearing weighs so strongly against Sahara that we reject its due process claim.

1.

Sahara's private interest will be greatly affected by beginning recoupment. Counsel represents that "the government's recoupment will force Sahara out of business[.]" In the district court, the Administrator of Sahara declared that about 75% of the company's revenue comes from the Medicare program and that full recoupment would cause the company to close. What is more, Medicare recoupments are not subject to an automatic stay in bankruptcy. *See Med-Cert*, 2019 WL 426465, at *9. Wrongly recouped funds will

---

[6] Even though the district court ruled that there is not a protected property interest at issue, the government declined to address whether Sahara possesses a valid property interest. In its briefing to this court, it offered only that "there is no need for this Court to resolve the issue." Similarly, at oral argument, the government demurred on the question, emphasizing that, "We're not saying rule that there's no property interest here."

be repaid with interest. *See* 42 U.S.C. § 1395ddd(f)(2)(B). But that will be cold comfort if Sahara has already closed its doors. The government correctly notes that providers are aware of the overpayment/recoupment regime. And since this appeal was filed, Sahara has entered a graduated repayment plan that ramps up from $10,000 to $75,000 on February 1, 2021. In sum, however, the threat to Sahara is real, and its private interest faces great harm.

The government interest, in comparison, is slight. Medicare possesses a broad systematic concern in recouping overpayments from providers. And the government has a valuable interest in conserving scarce administrative and financial resources. But as Sahara correctly notes, if at the end of the day, a provider is found to have been overpaid, the government gets its due sooner or later (with interest). The only questions here are *when* Sahara will pay and whether it will receive a hearing first. Accordingly, the private interest outweighs government interest.

Nonetheless, the adequate process that Sahara has received and the procedural protections it has chosen to forego weigh strongly, and decisively, against it. The constitutional minimum of due process guarantees that "notice and an opportunity to be heard be granted at a meaningful time and in a meaningful manner." *Gibson v. Tex. Dep't of Ins.*, 700 F.3d 227, 239 (5th Cir. 2012) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 (1972)) (internal quotation marks omitted). There is no dispute that Sahara received notice. The issue is whether it received a meaningful opportunity to be heard.

2.

"The type of hearing necessary—the process due—is a function of the context of the individual case." *Jones v. La Bd. of Sup'rs of Univ. of La. Sys.*, 809 F.3d 231, 236 (5th Cir. 2015). Sahara has already received two meaningful opportunities to be heard. At step one, it could submit a written statement and additional evidence. 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.948. The independent contractor provided a written, reasoned decision. 42 U.S.C. § 1395ff(a)(5). At step two, a different independent contractor delivered a reasoned, written decision after Sahara had the opportunity to provide additional evidence and written arguments of fact and law. 42 U.S.C. § 1395ff(c)(3)(E); 42 C.F.R. § 405.976(b). Sahara's claims were reviewed by a "panel of clinical experts consisting of a physician and a licensed health care professional" and a "statistician who evaluated the validity of the statistical sampling and extrapolation." This was not an exercise in rubberstamping: those two reviews lowered Sahara's overpay amount from $3,573,595.61 to $2,416,157.10. And these two steps were just a part of the "comprehensive whole that ends with an opportunity for timely judicial review." *See Accident, Injury & Rehab.*, 943 F.3d at 204.

Sahara does not explain why steps one and two, standing alone, fail to satisfy the constitutional requirement. Instead, Sahara dwells on the procedural additions of the step-three ALJ hearing. According to Sahara, "an ALJ hearing provides essential procedural safeguards . . . in its Medicare appeal of the alleged overpayment." It is true that a step-three hearing may offer "the opportunity to have a live hearing, present testimony, cross-examine

witnesses, and submit written statements of law and fact." *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 499 (5th Cir. 2018) (citing 42 C.F.R. § 405.1036(c)–(d)). But Sahara fails to demonstrate what value the hearing would add to the process Sahara has already received or is otherwise entitled to receive.

First, Sahara concedes that the hearing will not develop the factual record. Absent good cause, additional evidence can only be provided in steps one and two. *See* 42 U.S.C. § 1395ff(b)(3). And Sahara does not argue that it can demonstrate good cause. Similarly, the step-three hearing does not permit a provider to compel discovery beyond the administrative record that was compiled at steps one and two. *See* 42 C.F.R. § 405.1036(f)(1); *id.* §§ 405.1012, 405.1037(a).

Second, Sahara does not explain how the possibility of cross-examination at the hearing would benefit it. Cross-examination or a live hearing may be constitutionally required "where credibility [is] critical." *See Walsh v. Hodge*, No. 19-10785, 2020 WL 5525397, at *6 (5th Cir. Sept. 15, 2020); *see also Mathews*, 424 U.S. at 343–44 (analyzing whether "issues of witness credibility and veracity . . . are critical to the decisionmaking process"); *accord Doe v. Baum*, 903 F.3d 575, 584 (6th Cir. 2018) (explaining, in context of Title IX disciplinary hearing, that "if credibility is in dispute and material to the outcome, due process requires cross-examination"); *cf. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R.

pt. 106) (requiring postsecondary institutions to hold live disciplinary hearings and allow cross-examination in Title IX sexual misconduct proceedings).

Sahara does not submit that the credibility or veracity of the government's witnesses are at issue here. *Cf. Jones v. La. Bd. of Sup'rs of Univ. of La. Sys.*, 809 F.3d 231, 237 (5th Cir. 2015) (noting that "[i]t is difficult to see exactly where veracity or credibility would come into play" in a decision, based on applying organization policies to a paper record, which was "unrelated to the [plaintiff's] actions"). Indeed, Sahara does not identify a single point of inquiry it would pursue or a single dispute of material fact that it would address if given the opportunity to cross-examine the government's witnesses. *Cf. Plummer v. Univ. of Houston*, 860 F.3d 767, 783 (5th Cir. 2017) (Jones, J., dissenting) ("[A]dditional or substitute safeguards would have enhanced the quality of factfinding and adjudication by providing a confrontation right *if material fact issues existed*.") (emphasis added). In short, Sahara does not explain what, in this case, cross-examination would add.

Third, even if Sahara received the *hearing* that it requests, it is unlikely that it would even receive the opportunity to cross-examine a witness. At the hearing, the ALJ "may not issue a subpoena to CMS or its contractors, on his or her own initiative or at the request of a party, to compel an appearance, testimony, or the production of evidence." 42 C.F.R. § 405.1036(f)(1). In other words, cross examination is only available if HHS chooses it to be. Sahara does not assert that this regulation or the statutory scheme is unlawful. Perhaps that is because Sahara does not even assert that it desires to

subpoena any witness, much less identify who those witnesses would be and why their presence would add value.

Sahara contends that the step-three hearing "provides essential procedural safeguards," but cannot explain what those safeguards are. The step-three hearing does not allow a provider to supplement the record and does not ensure that any government witnesses will be available. That means that "the very procedural safeguards that [Sahara] argues are critical are far from assured even at the ALJ hearing level." *Accident, Injury & Rehab.*, 943 F.3d at 204 (holding that the Medicare recoupment escalation procedure provided due process where the step-three ALJ hearing was functionally unavailable). In other words, Sahara's "argument relies on a faulty understanding of the relative benefits of an ALJ hearing and judicial review." *Id.* And Sahara does not allege that the recoupment procedure itself is structured in an unconstitutional way.

Here, "the risk of erroneous deprivation and the likely value of any additional procedures" is "the factor most important to resolution of this case." *Gilbert v. Homar*, 520 U.S. 924, 933 (1997). Sahara has failed to demonstrate why that factor weighs in its favor. Accordingly, it has failed to demonstrate why the overall *Mathews* balance favors it as well.

3.

Congress foresaw that an ALJ backlog may arise. It provided a solution: a provider may "escalate" an appeal directly from step two to step four (Appeals Board review) if no decision has been rendered 90 days after timely notice. 42 U.S.C. § 1395ff(d)(3)(A). Sahara chose not to take that route,

which would have resulted in a *de novo* decision rendered within 180 days. *See* 42 U.S.C. § 1395ff(d)(2)(A); 42 C.F.R. § 405.1100(c). And if the Appeals Board were to exceed 180 days, Sahara could receive (admittedly deferential) judicial review before an Article III judge. *See* 42 U.S.C. § 1395ff(d)(2)(A); *Am. Hosp. Ass'n*, 812 F.3d at 191.

The Constitution entrusts the political branches, not the judiciary, with making difficult and value-laden policy decisions. There were an infinite number of schemes Congress could have reasonably selected. Congress settled on one that guarantees at least two levels of administrative review and judicial review. And in the case of a backlog, Congress provided the ability to bypass long waits on the way to judicial review. Sahara rejected that option. At bottom, Sahara believes a different scheme would be better. But we lack the power to change it. "[U]nless Congress exceeds its authority or trespasses on a protected area, judges are bound to respect its decisions—no matter what policy disagreements they may have with Congress's choices." Diarmuid F. O'Scannlain, *The Role of the Federal Judge in the Constitutional Structure: An Originalist Perspective*, 50 San Diego L. Rev. 517, 520 (2013). We have no opinion on the prudence of Congress's choice—and we do not need one. The Due Process Clause, not personal opinion, determines the outcome.

Our only sister circuit to face this question reached the same conclusion. The Fourth Circuit recently vacated an injunction that barred "HHS from pursuing recoupment efforts until [the plaintiff-provider] could challenge the recoupment amounts in a hearing before an ALJ." *See Accident,*

*Injury & Rehab.*, 943 F.3d at 197.  The court discussed two fatal flaws to the plaintiff's theory.  First, the provider was myopically focused on the tree of the hearing while it ignored the forest of the full comprehensive five-step scheme of procedural protections.  *See id.* at 204.  Second, the provider, by seeking an injunction instead of the statutorily prescribed escalation procedures, could not then "complain that its election denie[d] it due process."  *Id.*  We agree on both points.  The step-three hearing is just one part of a procedurally protective whole.  And Sahara cannot complain about lacking due process when the privation (foregoing escalation and judicial review) was its own choice.

Sahara received some procedure, chose to forego additional protections, and cannot demonstrate the additional value of the hearing it requests.  The procedure it received was constitutionally adequate, and we affirm the district court's dismissal of Sahara's due process claim.  We likewise affirm the district court's denial of injunctive relief.

### B.

Sahara devotes a single page to its *ultra vires* argument.  It argues that injunctive relief is appropriate because "[t]he government has initiated recoupment of Sahara's current payments" even though it "failed to provide an administrative appeal in accordance with 42 U.S.C. § 1395ff."  This claim fails too.

The statute entitles a provider to two steps of administrative review before the government recoups funds.  *See* 42 U.S.C. § 1395ff(a)(3) (step one); 42 U.S.C. § 1395ff(b)(1)(A) (step two).  Sahara received that review.

The statute does not prohibit recoupment after step two. *Cf.* 42 U.S.C. § 1395ddd(f)(2)(A) (prohibiting recoupment during steps one and two); 42 C.F.R. § 405.379(d)(4)–(5) (authorizing recoupment after step two). Congress afforded a provider who has not received a timely ALJ hearing the right to escalate to the Appeals Board. 42 U.S.C. § 1395ff(d)(3)(A). Sahara rejected that remedy. The Secretary and the Administrator acted within their statutory limits and we affirm the district court's dismissal of Sahara's *ultra vires* claim.

Sahara's out-of-circuit authority does not save it. It relies on a D.C. Circuit case that, in dicta, remarked that "nothing suggests that Congress intended escalation to serve as an adequate or exclusive remedy where, as here, a systemic failure causes virtually all appeals to be decided well after the statutory deadlines." *See Am. Hosp. Ass'n*ˌ 812 F.3d at 191. But *American Hospital* was a very unusual case. Hospitals sought to mandamus the Secretary of HHS to comply with the 90-day hearing requirement and to solve the problem of the multi-year backlog. *Id.* at 185. The court held that mandamus jurisdiction existed, but that issuance of the writ was premature. It told Congress that "given the unique circumstances of this case, the clarity of the statutory duty likely will require issuance of the writ if the political branches have failed to make meaningful progress within a reasonable period of time—say, the close of the next full appropriations cycle." *Id.* at 193.

Congress heeded that warning and appropriated $182.3 million to address the appeals backlog, "more than doubl[ing] [the agency's] FY 2017 disposition capacity." *Am. Hosp. Ass'n v. Azar*, No. 14-cv-851, 2018 WL

No. 18-41120

5723141, at *2 (D.D.C. Nov. 1, 2018).  As a result, the agency is under a mandamus order to eliminate the backlog by the end of fiscal year 2022.  *See id.* at *3.  The "unique circumstances" that justified the *American Hospital* decision are no longer present.  *See Am. Hosp. Ass'n*, 812 F.3d at 193.  The case is inapposite to Sahara's present claim.

Sahara fails to state a claim for *ultra vires* actions.  The district court did not err by denying injunctive relief on that ground.

\* \* \*

An unwieldly backlog of cases has prevented Sahara Health Care from receiving a hearing from an administrative law judge.  Congress predicted this might happen, and provided a statutory solution: the ability to escalate the appeal, culminating in judicial review.  Sahara has chosen not to avail itself of that option.  Given that choice, it cannot complain that it was denied due process or that the government acted *ultra vires*.  We AFFIRM the judgment of the district court.